IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

PHYLLIS DIANE PARSONS,

      Plaintiff,

v.                              CASE NO. 2:10-cv-00151

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge. Presently pending before the court are the parties' motions in support of judgment on the pleadings, Plaintiff's motion to remand, and Defendant's opposition to Plaintiff's motion to remand.[1]

Plaintiff, Phyllis Diane Parsons (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on August 18, 2006, alleging disability as of March 1, 2005, due to neuropathy, carpal

---

[1] The court reminds the parties that pursuant to Local Rule of Civil Procedure 9.4(a), the parties need not file motions in support of judgment on the pleadings. Instead, Plaintiff should file "a brief in support of the complaint," while Defendant files "a brief in support of the defendant's decision." Local Rules of the United States District Court for the Southern District of West Virginia, Local Rule of Civil Procedure 9.4(a).

tunnel in right arm, rheumatoid arthritis, bulging disc in lower back, arthritis in lower back, anemia, anxiety attacks, acid reflux, pain in back and hands, depression, tendonitis in knees and feet, severe mood swings, lack of libido, bad memory, and fibromyalgia. (Tr. at 11, 129-32, 133-38, 194-200, 226-32, 250-56.) The claims were denied initially and upon reconsideration. (Tr. at 11, 54-58, 59-63, 72-74, 75-77.) On May 23, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 78.) The hearing was held on January 31, 2008 before the Honorable James P. Toschi. (Tr. at 25-49, 84.) By decision dated March 5, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-24.) The ALJ's decision became the final decision of the Commissioner on January 29, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) On February 16, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §

2

423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age,

education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 12.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic arthralgias, degenerative disc disease of the lumbar spine, carpal tunnel syndrome, peripheral neuropathy and obesity.  (Tr. at 12-16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-17.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 17-22.)  As a result, Claimant cannot return to her past relevant work.  (Tr. at 22.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as sales clerk, general clerk, and counter attendant, which exist in significant numbers in the national economy.  (Tr. at 23.)  On this basis, benefits were denied.  (Tr. at 24.)

Motion to Remand

The court will turn first to Plaintiff's Motion to Remand for New and Material Evidence.  Claimant has moved this court, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to remand her claim to the administrative level for consideration of additional evidence.

In considering Claimant's motion to remand, the court notes initially that the Social Security regulations allow two types of remand.  Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).  Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir.

1985).[2]  In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

Submitted with Claimant's motion for remand are 48 pages of treatment notes attributed to Ghali Bacha, M.D., "covering the period from March 13, 2008 through July 29, 2010." (Pl.'s Motion at

---

[2] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in Borders provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in Wilkins v. Secretary of Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  However, Borders has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that Borders' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent Borders inquiry.

Brock v. Secretary, Health and Human Servs., 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

1.)  The court has reviewed all of the submitted evidence and finds that most of the assessment notes are undated.  The three treatment notes signed by Dr. Bacha are dated March 13, 2008, June 11, 2008, and July 10, 2008.  (Pl.'s Motion, #17-2 at 2-5.)  Dr. Bacha's March 13, 2008 notes state:

> ASSESSMENT:
> 1.   Hypersomnolence  and  fatigue with symptoms
>      suggestive of OSA [Obstructive Sleep Apnea] versus
>      severe depression.
> 2.   Severe depression needs adjustment.
> 3.   GAD [Generalized Anxiety Disorder].
> 4.   Fibromyalgia.
> 5.   Osteoarthritis of the spine, mild.
> 6.   History of radiculopathy of the lumbar spine.
> 7.   History of hiatal hernia.
> 8.   Active nicotine abuse.
>
> PLAN: Emphasize the need to increase physical activity
> and  mild-to-moderate  aerobic  exercises  that  would
> alleviate  all  her  muscle  pains...Obtain  bone  scan  to
> evaluate generalized arthralgias...

(Pl.'s Motion, #17-2 at 2.)

Dr. Bacha's June 11, 2008 treatment notes include this assessment: "1. Depression. 2. OSA. 3. Osteoarthritis of the spine. 4. Chronic arthralgia. 5. Paresthesias in the legs." (Pl.'s Motion, #17-2 at 4.)

Dr. Bacha's July 10, 2008 treatment notes include this assessment: "1. Arthralgia. 2. Depression. 3. GAD." (Pl.'s Motion, #17-2 at 5.)

Claimant's asserts that the new records qualify under the four requirements:

The  nature  of  the  records  are  established  by  their

7

inclusion herein.  Because many of the records did not
exist at the time the case was before the Commissioner,
the Plaintiff has good cause for not submitting them at
that time.  The records are relevant to the determination
of disability during the relevant time period for the
following reasons.   In determining credibility, a
person's longitudinal medical history is very important.
See Social Security Ruling 96-7p.  This is especially
true with fibromyalgia as the disease is almost entirely
subjective and is a "rule out" disease.  If the ALJ had
these records before him, it is almost certain he would
not have ignored her fibromyalgia, would have found it,
as well as her mental condition, headaches and other
impairments, severe conditions.    The record also
documents that there is a significant psychological
component   to   her   pain   condition.    Thus,   the
Commissioner's decision might reasonably have been
different if the new evidence had been available to him.
Under similar circumstances, this court has remanded
cases.  See Memorandum Opinion and Remand Order in
*Ferrebee v. Astrue*, C.A. #2:09-cv-00874, September 30,
2010, included herein as Plaintiff's Exhibit "B."

(Pl.'s motion at 2-3.)

First, the undersigned notes that Claimant's reliance on the

Memorandum Opinion and Remand Order in <u>Ferrebee v. Astrue</u>, C.A.

#2:09-cv-00874, September 30, 2010, is misplaced as the motion in

that case was unopposed.  Here, the Commissioner filed a memorandum

in opposition to Claimant's motion to remand, asserting that

Claimant cannot carry her burden as to any of the three prongs of

<u>Wilkins</u>.  (Def.'s memorandum at 1-8.)

Pursuant to <u>Borders</u>, the court must first determine if the

newly discovered evidence is relevant to the determination of

disability at the time the application was first filed and not

simply cumulative.  Claimant's representative admits that the

records are submitted to document Claimant's "longitudinal medical

history...[of] fibromyalgia." (Pl.'s Motion at 2.) Therefore, the court finds the evidence is cumulative.  It is further noted that the evidence is not directly relevant to the determination of disability at the time period before the ALJ.  The ALJ Decision was made on March 5, 2008.  (Tr. at 24.)  The evidence submitted by Claimant is for the time period March 13, 2008 through July 29, 2010.  (Pl.'s Motion at 1.)

The court observes that arguably some of the additional evidence could be pertinent, as it is close in time to the evidence before the ALJ.  However, at the next inquiry, the court finds that Claimant cannot carry her burden.

At the second inquiry, the court must determine if the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him.  The undersigned finds that contrary to Claimant's representative's assertion, the ALJ in his decision made several references to Dr. Bacha's diagnoses of fibromyalgia and arthralgias and concluded that Claimant's "chronic arthralgias" were a severe impairment. (Tr. at 12-14.)  Therefore, Claimant's argument, that if the ALJ had the additional records from Dr. Bacha that his decision may have been different and "he would not have ignored her fibromyalgia", is without merit and frankly, puzzling.  As demonstrated on page 7 of this Memorandum Opinion, Dr. Bacha uses the terms "fibromyalgia" and "arthralgia" interchangeably in his

9

treatment notes - those in the record before the ALJ and those submitted with Claimant's motion for remand. (Pl.'s Motion, #17-2 at 2-5, 9, 15, 17, 31, 45.)

Next, the court must determine if there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner.   Claimant asserts that there is good cause because "many of the records did not exist at the time the case was before the Commissioner." (Pl.'s Br. at 2.)   The court notes that Claimant's counsel offers no explanation as to why the records existing during the time period for submission to the Appeals Council were not presented to the Appeals Council.   However, the court finds the "good cause" issue moot in this case as the evidence is cumulative and not directly relevant to the determination of disability at the time period before the ALJ.

The court concludes that Claimant has satisfied the final <u>Borders</u> inquiry by providing "at least a general showing of the nature" of the newly discovered evidence.   However, the court **FINDS** Claimant has not satisfied all four factors of <u>Borders</u> and, therefore, remand is not appropriate pursuant to the sixth sentence of 42 U. S. C. §405(g).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was

10

defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty-two years old at the time of the administrative hearing.  (Tr. at 22.)  She has a high school education, completed a business administration program at a career center, and completed 300 hours towards certification at a cosmetology school.  (Tr. at 199, 329.)  In the past, she worked as a waitress, cashier, stock person, cook, shift supervisor, receptionist, and caregiver.  (Tr. at 44, 201, 605.)  She also co-

11

owned and worked at a video and tanning business.   (Tr. at 201.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

On October 13, 1992, R. Jones, M.D. performed "Yoon Ring tubal occlusion" sterilization surgery on Claimant at Charleston Area Medical Center ["CAMC"]   (Tr. at 412-415.)

On July 1, 2001, Claimant went to St. Francis Hospital's Emergency Room ["ER"] for right shoulder and arm pain. (Tr. at 307-10, 319-23.)   She was diagnosed with a muscle strain and released with instructions to apply warm compresses three times a day and prescribed Flexeril and Naprosyn.   (Tr. at 311.)

On September 9, 2001, Claimant went to St. Francis Hospital ER with complaints of pain in the right shoulder, arm, and hand.   (Tr. at 312.)   Claimant was discharged after being administered Toradol.   (Tr. at 314.)

Records indicate Claimant received chiropractic treatments from Paul Casingal, D. C. on approximately fifty-four occasions from July 25, 2003 to March 2, 2007.   (Tr. at 444-78.)   Dr. Casingal initially diagnosed Claimant with cervicalgia on July 25, 2003.   (Tr. at 474.)   At an August 11, 2003 examination, Claimant's diagnosis was "lumbar spine disc syndrome."   (Tr. at 469.) While under his care, Dr. Casingal obtained lumbar and cervical spine x-

12

ray reports from Kenneth Dwyer, M.D., radiologist, on July 30, 2003
and August 16, 2003.  He reported: "Lumbar Spine...Impression:
First degree Spondylolisthesis at L5-S1 with mild degeneration of
the discs.  No acute fracture identified."  (Tr. at 480.)
"Cervical Spine...Impression: Mild degenerative changes are present
without evidence of acute bone process."  (Tr. at 481.)  On March
2, 2007, Dr. Casingal described Claimant's history as "L/ [lumbar]
spine disc syndrome, osteoarthritis."  (Tr. at 444.)  Dr. Casingal
obtained a lumbar spine MRI of Claimant on May 11, 2004 from Dr.
Dwyer, who reported:

> Impression: Prominent degeneration of the disc is present
> at the L5-S1 level with generalized protrusion of the
> disc posteriorly which in combination with hypertrophic
> bone formation and with bilateral facet joint arthritis
> produces some compromise of the outlet foramen
> bilaterally.  There is more compromise of the outlet
> foramen on the left side by the disc bulge and the facet
> joint arthritis which could be producing radicular pain.

(Tr. at 479.)

Records indicate Ghali Bacha, M.D. treated Claimant on
nineteen occasions for a variety of conditions from May 25, 2004 to
November 14, 2007.  (Tr. at 523-603.) The initial report dated May
25, 2004 assesses Claimant as having "1.  Discogenic back disease.
2.  DJD [Degenerative Joint Disease], lumbar spine."  (Tr. at 561.)
On July 1, 2004, the assessment was: "1.  Discogenic back disease.
2.  Goiter.  3.  Hyperlipidemia, by history... 4.  Tachycardia."
(Tr. at 560.)  On July 19, 2004, the assessment was "1. Discogenic
back disease.  2.  Hyperlipidemia based on recent lab work.  3.

13

Chronic back pain.  4.  Possible sleep apnea versus alpha intrusion into her sleep causing worsening case of fibromyalgia." (Tr. at 559.)  On August 30, 2005, the assessment was: "1. Goiter.  2. Hyperlipidemia.  3.  Nicotine addiction.  4.  Insomnia.  5. Depression, possible bipolar disorder." (Tr. at 558.) On December 2, 2004, the assessment was: "1. GE reflux. 2. Chronic back pain. 3.  Nicotine addiction."  (Tr. at 556.)  On April 5, 2005, the assessment was: "1.  Dyspepsia with GE [gastroesophageal] reflux. 2.  Possible IBS [Irritable Bowel Syndrome].  3.  Abdominal pain." (Tr. at 554.)  On June 20, 2005, the assessment was: "1. Chronic GE reflux, possible underlying IBS.  2.  GAD [Generalized Anxiety Disorder] vs. bipolar disorder.  3. Hyperlipidemia. 4. Nicotine addiction.  5.  Hiatal hernia."  (Tr. at 553.) On June 28, 2005, the assessment was: "1. GAD with bipolar features.  2.  Insomnia with possible restless legs.  3.  Hyperlipidemia, needs close monitoring.  4.  Right thumb tendinitis."  (Tr. at 552.)  On July 28, 2005, the assessment was: "1. Headache.  2. Insomnia.  3. GAD." (Tr. at 550.)  On August 29, 2005, the assessment was: "1. Possible medication side effects.  However, Cymbalta is not surely the only reason for her rash.  2.  Headache improving.  3. Depression."  (Tr. at 548.)  On January 3, 2006, the assessment was: "1.  Headache.  2.  GAD.  3.  Smoking with underlying cough. 4.  COPD, possible.  5.  Abdominal discomfort, workup negative for hiatal hernia and possible IBS." (Tr. at 546.)  On March 6, 2006,

14

the assessment was: "1.   Osteoarthritis of both hands.   2.
Paresthesias of hands.   Medication related versus CTS [Carpal
Tunnel Syndrome]? 3.   Dysipidemia." (Tr. at 544.)   On April 27,
2006, the assessment was: "1.   Anemia.   Related to heavy
menstruation and DUB [Dysfunctional Uterine Bleeding]? 2.   Iron
deficiency related to that. 3.  Snoring and symptoms suggestive of
OSA [Obstructive Sleep Apnea]." (Tr. at 542.)   On June 19, 2006,
the assessment was: "1.   Anemia of iron deficiency... 2.   GE
reflux... 3.   Dysipidemia... 4.  Dyspnea and cough, but the patient
continues to smoke.   5.   CTS both hands right more than left."
(Tr. at 540.)   On August 21, 2006, the assessment was: "1. Anemia,
resolved.   2.   GAD with underlying depression.   3.   Headache
worsened by above.   4.   Hypertension.  5.   Dysipidemia.  (Tr. at
538.) On October 9, 2006, the assessment was: "1.  Headache, most
likely tension headache in nature.   2.   GAD.   3.   Chronic back
pain.  4.  Hypertension, controlled." (Tr. at 536.)  On April 23,
2007, the assessment was: "1.  GAD/depression.   2.   Goiter,
asymptomatic.   3.   Dysipidemia." (Tr. at 530.)   On August 20,
2007, the assessment was "1. Low back pain, chronic.  2. GE reflux.
3.  GAD, Depression.  4.   Possible OSA [Obstructive Sleep Apnea],
the patient is refusing evaluation." (Tr. at 527.)   On November
14, 2007, the assessment was: "She remains with arthralgias, back
pain, leg pain and hand pain diagnosed with CTS, but all workup,
otherwise was negative including recent x-rays.  She has anxiety,

15

irritability and severe depression...1. Acute bronchitis. 2.
COPD. 3. Nicotine addiction. 4. Arthralgia most likely
fibromyalgia." (Tr. at 523.)

On April 28, 2005, Bassam M. Haffar, M.D., Thomas Memorial
Hospital performed an upper endoscopy on Claimant and diagnosed
hiatal hernia and mild gastroesophageal reflux ["GERD"]. (Tr. at
323-24.) He recommended increasing Prevacid to twice a day. Id.

On November 28, 2005, Claimant presented to CAMC ER with
breathing complaints. (Tr. at 351-73.) Penny S. Divita, D.O. noted
a history of smoking and asthma. (Tr. at 351.) Stephen M. Elksnis,
M.D., radiologist, reviewed PA and lateral chest views and
concluded: "The heart size is normal. The lungs are clear. The
pulmonary vascularity is normal. Impression: No radiographic
evidence of acute cardiopulmonary disease." (Tr. at 365.)

On March 27, 2006, Samer Nasher, M.D., Neurology and Pain
Center, stated that he evaluated Claimant's "numbness of the hands"
at the referral of Dr. Ghali Bacha. (Tr. at 120, 495.) He
concluded that Claimant showed positive Tinel sign bilaterally,
peripheral neuropathy, carpal syndrome, low back and neck pain.
Id. He recommended blood work, a nerve study, and a splint for her
carpal tunnel. Id. Illegible handwritten progress notes show
Claimant was also treated by Dr. Nasher on April 17, 2006, May 22,
2006, July 31, 2006, September 14, 2006, December 26, 2006,
February 15, 2007, November 6, 2007, and November 27, 2007. (Tr. at

16

109-27, 485-500.)

On November 30, 2006, Claimant presented to the CAMC ER with complaints of "I just don't feel good." (Tr. at 334.) John A. Turley, M.D. diagnosed "viral syndrome" and discharged her with instructions for bed rest and fluids. (Tr. at 336.)  Dr. Turley stated:

> Urinalysis is normal exam.   Chest x-ray: No acute infiltrate per Dr. Leef.  Comprehensive metabolic panel: potassium low at 3.4, carbon dioxide low at 19, AST low at 14, ALT low at 9, otherwise normal.  TSH is normal. Complete blood count is normal...She is given ibuprofen 800 mg p.o. for her headache which provided good relief and she was given a liter of normal saline bolus was feeling much better when she was reassessed.

(Tr. at 336.)

On December 21, 2006, a State agency medical source completed an internal medicine examination. (Tr. at 416-21.)   The examiner, Kip Beard, M.D. reached these conclusions:

> IMPRESSION:
> 1.    Peripheral neuropathy.
> 2.    Chronic low back pain with reported history of lumbar spondylosis and degenerative disk disease.
> 3.    Chronic joint pain.
>      a.  Osteoarthritis.
>      b.  Reported history of rheumatoid arthritis.
> 4.    Right carpal tunnel syndrome.
> 5.    Iron deficiency anemia, resolved according to progress notes on the chart.
>
> SUMMARY: The claimant is a 41-year-old female with history of chronic back pain.  Examination of the back today reveals some mild pain and muscular tenderness and some mild motion loss without findings of radiculopathy.
>
> There is also history of joint pain.  Examination of the joints reveals some patellar femoral crepitus of the right knee with some mild motion abnormalities and some

17

> mild pain and tenderness.  Findings are consistent with
> osteoarthritis.  I did not appreciate any synovitis or
> synovial thickening or evidence of inflammatory
> arthritis.
>
> Regarding carpal tunnel syndrome, examination today
> reveals no appreciable intrinsic hand atrophy.
> Provocation testing appeared negative today.  Sensory
> loss in the hands appeared nonspecific.  Grip strength
> was symmetric and manipulation was well preserved.
>
> Regarding anemia, according to follow up progress notes,
> this has since resolved.  Examination is unremarkable in
> relation to anemia.

(Tr. at 421.)

On December 29, 2006, a State agency medical source completed
a Physical Residual Functional Capacity Assessment and opined that
Claimant could perform light work.  (Tr. at 437.) Claimant's
primary diagnosis was "neck/back pain/radiation to left leg." (Tr.
at 436.)  Claimant's secondary diagnosis was "morbid obesity level
II."  Id. The evaluator A. Rafael Gomez, M.D. determined Claimant
could occasionally perform all postural limitations with the
exception of climbing ladder/rope/scaffolds and had no
manipulative, visual, or communicative limitations.  (Tr. at 436-
439.) He also determined she had no environmental limitations save
to avoid concentrated exposure to vibration and hazards.  (Tr. at
440.)  Dr. Gomez concluded:

> Credibility could not be established.  Patient has neck
> and back pain with radiation to the left leg.  She has
> stocking type sensory loss of the left leg and this has
> been diagnosed as neuropathy.  However the motor power is
> intact.  No neurological deficit is described.  Has slow
> gait and decrease in ROM's [range of motions] lumbar
> spine.  She has morbid obesity level II.  Has a diagnosis

18

> of CTS [carpal tunnel syndrome] on the right side,
> however the numbness is described as non specific.
> Reduced to light work.

(Tr. at 441.)

On May 8, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work.  (Tr. at 502.)  Claimant's primary diagnosis was "degen [degenerative] chngs [changes] B [both] hands w/ [with] erosions."  (Tr. at 501.)  Claimant's secondary diagnosis was "degenerative chngs lumbar spine."  Id. The evaluator Amy Wirts, M.D. determined Claimant could occasionally perform all postural limitations with the exception of climbing ladder/rope/scaffolds and crawling and had no visual or communicative limitations.  (Tr. at 503-505.) She also determined Claimant had manipulative limitations with handling, fingering, and feeling noting "mild limitation BUE [bilateral upper extremity] in gross and fine manipulation. Claimant is R [right] handed" but no limitations in reaching in all directions, including overhead. (Tr. at 504.) Regarding environmental limitations, she opined that Claimant should avoid concentrated exposure in all areas save noise and fumes, odors, dusts, gases, poor ventilation which were marked as "unlimited."  (Tr. at 505.)  Dr. Wirts concluded:

> Claimant's allegations are credible.  Claimant has
> rheumatoid arthritis of the hands.  X-rays of both hands
> 2/06 show degenerative changes at the base of the first
> metacarpal joint space, greater on the right than left
> with erosions and metacarpal joint space, greater on the
> right than left with erosions and hypertrophic bone

19

formations.  There are erosions at the base of the first
and second metacarpal and of the first multangular [sic].
ESR 3/8/07 is elevated at 36 mm/hr and 37 mm/hr on
3/6/06.  CE [clinical examination] 12/06 notes no hand
atrophy with grip strength and manipulation well
preserved.  There is no appreciable synovitis or synovial
thickening.  She does house cleaning and does some
laundry.

(Tr. at 506.)

In an undated "Arthritis/Musculoskeletal RFC Questionnaire,"
Dr. G. Bacha states that Claimant had an "initial visit 2004,
monthly visits" thereafter.  (Tr. at 301.)  He states Claimant's
diagnoses are: "Osteoarthritis, lumbar radiculopathy, peripheral
neuropathy, degenerative disc disease L5-S1, depression, GAD, GERD,
fibromyalgia, CTS, goiter."  Id.  Dr. Bacha indicated that Claimant
was not a malinger, had a fair prognosis, had "good days" and "bad
days", would miss about three times a month from work as a result
of impairments or treatment, could sit less than two hours, stand
and walk about two hours in an 8 hour working day, could
occasionally climb stairs, never crouch or climb ladders, rarely
twist and stoop, never lift more than ten pounds, and rarely lift
less than 10 pounds, and was capable of low stress jobs.  (Tr. at
301-03.)

On January 31, 2008, Samer Nasher, M.D., Neurology and Pain
Center, completed a form titled "Arthritis/Musculoskeletal/
Fibromyalgia RFC Questionnaire."  (Tr. at 628-33.) Dr. Nasher did
not mark an answer to the question: "Does your patient meet the
American Rheumatological criteria for fibromyalgia?" (Tr. at 628.)

20

Although the handwritten portions of the form are largely
illegible, it appears that Dr. Nasher's diagnoses is "chronic LBP
[lower back pain]/lumbar radiculopathy" with additional illegible
lettering. Id. Claimant's symptoms are marked as: "multiple tender
points; morning stiffness; numbness and tingling; frequent, severe
headaches; carpal tunnel syndrome." Id. He describes her
prognosis as: "Chronic with flare up times. Fair." (Tr. at 629.)
He states that Claimant is not a malinger, has drowsiness as a side
effect of her medications, that it is "possible" Claimant's
impairments lasted or can be expected to last twelve months. Id.
He further marks that Claimant's impairments are likely to produce
"good days" and "bad days" and that she would, on average, likely
be absent from work about two times per month as a result of the
impairments or treatment. Id. He marked that Claimant can walk
two blocks without rest or severe pain, can sit about 4 hours in an
eight hour working day (with normal breaks), and would need one to
two unscheduled breaks during an eight hour working day. (Tr. at
630.) He marked that Claimant is capable of tolerating moderate
work related stress and can frequently lift ten pounds and less and
twist. (Tr. at 631.) He marked that Claimant can rarely lift
twenty pounds, stoop, climb stairs and occasionally crouch and
climb ladders and never lift fifty pounds. Id.

Psychiatric Evidence

        On November 25, 2006, a State agency medical source completed

21

a psychological evaluation of Claimant.  (Tr. at 327-31.)  Lisa C.
Tate, M.A., Licensed Psychologist, provided a clinical interview
and examination, wherein she concluded:

> MENTAL STATUS EXAMINATION: Orientation: She was alert
> throughout the evaluation.  She was oriented to person,
> place, time and date.  Mood: Observed mood was anxious.
> Affect: Affect was mildly restricted.  Thought
> Processes:...appeared logical and coherent.  Thought
> Content:  There were no indication of delusions,
> obsessive thoughts or compulsive behaviors.  Perceptual:
> She reports no unusual perceptual experiences other than
> thinking at times she hears someone knocking at her front
> door.  Insight: Insight was fair.  Judgment: Judgment was
> within normal limits based on response to the finding the
> letter question.  She says she would "take it to the post
> office."  Suicidal/Homicidal Ideation: She denies
> suicidal or homicidal ideation.  Immediate
> Memory:...within normal limits...Recent Memory: Mildly
> deficient...Remote   Memory:...mildly   impaired...
> Concentration: Within normal limits based on the Digit
> Span subtest score.  Psychomotor Behavior:...normal.
>
> DIAGNOSTIC IMPRESSION:
>
> Axis I    300.02    Generalized anxiety disorder.
> Axis II   V71.09    No diagnosis.
> Axis III            By self report, neuropathy.  Carpal
>                     tunnel in the right arm.  Rheumatoid
>                     arthritis. Bilateral foot problems.
>                     Bulging disk in the lower back.
>                     Migraines.  Arthritis in the lower
>                     back. Anemia.  Acid reflux.
>
> RATIONALE: The diagnosis of generalized anxiety disorder
> is based on her report of frequently feeling
> anxious...Though she reports previous symptoms of panic,
> she has not experienced an attack since January of this
> year.
>
> DAILY ACTIVITIES: Typical Day:...she has no set sleep
> schedule.  When asked to describe her daily activities,
> she states, "Get a cup of coffee, sit down and drink my
> coffee, I make sure the kids are up and them ready for
> school."  Daily Activities: Taking a shower, doing
> laundry, watching television, and reading most of the

22

day.

<u>WEEKLY ACTIVITIES</u>: Cooking once a week, loading and unloading the dishwasher one to two times a week, dusting once a week, going with her husband to visit a friend two to three times a week, going to 7/11 one to two times a week.

<u>MONTHLY ACTIVITIES</u>: Going to the grocery store one to two times a month and visiting her sister one to two times a month.

<u>HOBBIES AND INTERESTS</u>: Reading.

<u>SOCIAL FUNCTIONING</u>:...within normal limits based on her interaction with staff during the evaluation.

<u>CONCENTRATION</u>:...within normal limits based on the Digit Span subtest score.

<u>PERSISTENCE</u>:...within normal limits.

<u>PACE</u>:...within normal limits.

<u>CAPABILITY TO MANAGE BENEFITS</u>:...appears competent to manage any benefits she may receive.

(Tr. at 329-31.)

On December 28, 2006, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 422-35.) The evaluator, Timothy Saar, Ph.D., found Claimant's impairment was not severe. (Tr. at 422.) Regarding Claimant's anxiety disorder, Dr. Saar concluded Claimant had no degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at 432.) He found the evidence does not establish the presence of the "C" criterion. (Tr. at 433.) Dr.

23

Saar noted: "Analysis: Clmt [claimant] appears credible. Clmt can manage basic ADLs [activities of daily living] and social interactions. CE [claim evaluator] noted C/P/P [concentration, persistence/pace] WNL [within normal limits]. The evidence does not support severe limitations in FC [functional capacity] due to a mental impairment. Decision - Impairment not severe." (Tr. at 434.)

On December 28, 2006, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 509-22.) The evaluator, Karl G. Hursey, Ph.D., found Claimant's impairment was not severe. (Tr. at 509.) Regarding Claimant's anxiety disorder, Dr. Hursey concluded Claimant had a mild degree of limitation in restriction of activities of daily living, and no degree of limitation related to difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at 519.) He found the evidence does not establish the presence of the "C" criterion. (Tr. at 520.) Dr. Hursey noted: "Based on the MER [medical evidence of record] the clmt's [claimant's] statements are generally credible. She reports that she avoids going out/leaving home d/t [due to] anxiety. However, she visits friends 2-3 times per week and goes grocery shopping 1-2 times per month." (Tr. at 521.)

On December 7, 2007, Sheila Emerson Kelly, M.A., Licensed

24

Psychologist, evaluated Claimant and provided Claimant's representative a report of psychological evaluation. (Tr. at 604-19.) Ms. Kelly reached these conclusions:

Residual Functional Capacity:
*Activities of Daily Living.*
Mrs. Parsons is very reliant on her husband and daughter to perform most of the household chores including cleaning, cooking and keeping the checkbook. Although she describes herself as being obsessive-compulsive and an individual who scrubs around sinks and toilets with a toothbrush, she admits that she leaves the vast majority of her housework to her husband and daughter. She has a drivers' license but does not drive and has not driven in quite some time. In general, she leads a very quiet, dependent, withdrawn, moderately paranoid day-to day existence.

*Social Functioning.*
Mrs. Parsons has significant issues of trust. She was sexually molested by her father throughout her childhood and this has affected her social functioning from then forward. In high school, her social phobia was expressed as a tendency to get into fights and to be exceedingly irritable. Since then she has developed a paranoid posture and is avoidant and very withdrawn. When possible, she avoids appearing in public and she has nothing in the way of a social support system outside of her immediate family.

*Concentration, Persistence, and Pace.*
Mrs. Parsons complains of deficiencies in concentration which are not confirmed by the test results today. Nonetheless, she is clearly chronically depressed and also, unconsciously, diverts a lot of depression and anxiety into somatic complaints of varying intensity. Those somatic complaints are used to obtain affection, attention, and support from her family and enable her to remain at home away from the public eye.

*Deterioration in Work or Work-like Setting.*
Although Mrs. Parsons describes herself as having been an individual who "worked all my life", it appears that over recent years she has been for the most part unemployed and supported by her husband. She is socially phobic and chronically depressed and her various illnesses are

25

unlikely to respond to medical treatment even if she were willing to undergo the procedures necessary to attempt to correct them.

Mrs. Parsons is competent to manage her own financial affairs should she be determined to be disabled.

Diagnostic Impression:

Axis I:    Depressive Disorder, Not Otherwise Specified Versus Major Depressive Disorder, Chronic Type History of Panic Disorder, Possibly with Agoraphobia
Social Phobia
Panic Disorder associated with General Medical Condition and Psychological Factors
Rule out Post Traumatic Stress Disorder Secondary to Childhood Sexual Abuse

Axis II:   Personality Disorder, Not Otherwise Specified, with Paranoid, Avoidant, Dependent, Passive-Aggressive, Hypochondriacal, and Self-Defeating Features

Axis III:  Neuropathy in Legs, Arms, and Back (I have no medical records with regard to this patient); Carpal Tunnel Syndrome Bilaterally; Fibromyalgia; Osteoarthritis in her Back, Knees, and Feet; tremor; "Knots in my Hands"; Chronic Pain.

(Tr. at 610-11.)

On December 7, 2007, Ms. Kelly also filled out a form indicating Claimant was "slightly limited" in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, ask simple questions or request assistance, respond appropriately to changes in a routine work setting, be aware of normal hazards and take appropriate precautions; "moderately limited" in her ability to make simple work-related decisions, get

26

along with co-workers or peers without unduly distracting them or
exhibiting behavioral extremes, maintain socially appropriate
behavior and to adhere to basic standards of neatness and
cleanliness, and travel in unfamiliar places or use public
transportation; "markedly limited" in her ability to understand and
remember detailed instructions, carry out detailed instructions,
maintain attention for extended periods, maintain regular attendance
and be punctual within customary tolerances, work in coordination
or proximity to others without being unduly distracted by them,
complete a normal work day and work week without interruptions from
psychologically based symptoms and to perform at a consistent pace
without an unreasonable number and length of rest periods, interact
appropriately with the general public, accept instructions and
respond appropriately to criticism from supervisors, and set
realistic goals or make plans independently of others. (Tr. at 615-
17.)  Ms. Kelly concluded that Claimant was not "extremely limited"
in any area.  Id.

Claimant's Challenges to the Commissioner's Decision

     Claimant asserts that the Commissioner's decision is not
supported by substantial evidence because (1) the ALJ did not
properly weigh the evidence; (2) the ALJ erred in finding Claimant's
mental impairments nonsevere; (3) the ALJ ignored Claimant's
diagnosis of fibromyalgia; (4) the ALJ did not properly consider
Claimant's impairment in combination with her other impairments; and

(5) the ALJ improperly assessed Claimant's credibility.  (Pl.'s Br. at 21-42.)

The Commissioner asserts that substantial evidence in the record supports the ALJ's finding that Claimant is not disabled because (1) the ALJ appropriately assessed the physical and mental impairment evidence; (2) the ALJ appropriately assessed Claimant's credibility; (3) the ALJ appropriately considered the opinion evidence, including that of treating physicians, Drs. Nasher and Bacha, and recognized Dr. Nasher's diagnosis of fibromyalgia and found that Claimant had the impairment of chronic arthralgias, which amply captures fibromyalgia; and (4) the ALJ appropriately considered Claimant's obesity.  (Def.'s Br. at 10-19.)

Claimant's Response (ECF No. 16) to the Commissioner's brief disputes the assertions regarding Claimant's credibility and asserts that the ALJ failed to weigh the evidence properly.  She repeats her accusation that the ALJ misunderstands fibromyalgia and its subjective symptoms.

<u>Weighing Medical Opinion Evidence</u>

Claimant first argues that the ALJ did not properly weigh the evidence of treating physicians, Dr. Bacha and Dr. Nasher, with that of the reviewing consultants.  (Pl.'s Br. at 22-26.) Specifically, Claimant asserts:

> After summarizing the limitations found by Dr. Bacha, the ALJ rejected his opinion of total disability on the grounds that "while...a treating source...these opinions are inconsistent with the treatment records and the

objective evidence of record." (Tr. 21). He rejected
Dr. Nasher's opinion on exactly the same grounds. *Id*.
Such blanket statements are unacceptable and incapable of
being judicially reviewed....Their opinions are
consistent with their treatment notes, Parson's testimony
and statements throughout the record, and the opinion of
Psychologist Sheila Kelly.

(Pl.'s Br. at 23-24.)

The Commissioner responds that the ALJ properly weighed the
physical and mental opinion evidence, and properly credited the
opinions of Drs. Nasher and Bacha, which conflicted with the
objective evidence, the treatment records, and the record as a
whole. (Def.'s Br. at 10-18.)

Under the regulations, more weight must be given to treating
sources than to non-examining sources (20 C.F.R. §§ 404.1527(d)(2)
and 416.927(d)(2) (2006)). Every medical opinion received by the
ALJ must be considered in accordance with the factors set forth in
20 C.F.R. § 416.927(d) (2006). These factors include: (1) length of
the treatment relationship and frequency of evaluation, (2) nature
and extent of the treatment relationship, (3) supportability, (4)
consistency (5) specialization, and (6) various other factors.
Additionally, the regulations state that the Commissioner "will
always give good reasons in our notice of determination or decision
for the weight we give your treating source's opinion." Id. §
416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner
than to a non-examiner. Section 416.927(d)(2) provides that more

29

weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The ALJ wrote an extensive fifteen page decision wherein he fully considered the evidence of record, including that of treating physicians Drs. Nasher and Bacha, wherein he found Claimant suffered from several severe impairments based upon their medical evidence, including chronic arthralgias. (Tr. at 11-25.) The ALJ also considered Claimant's other alleged impairments and determined them not to be severe, including history of headaches, which gave rise to no significant limitations and were largely controlled with medication; asthma, which she had not had an attack in five years; high blood pressure, which was controlled by medicine; anemia, which had resolved with treatment; right arm pain, which resolved;

and intermittent abdominal/gastrointestinal/thyroid complaints, which gave rise to no significant limitation. (Tr. at 12-15.) The ALJ found:

> The claimant has the following severe impairments: chronic arthralgias, degenerative disc disease of the lumbar spine, carpal tunnel syndrome, peripheral neuropathy and obesity (20 CFR 404.1520(c) and 416.920(c))...
>
> Dr. Ghali Bacha completed an undated Arthritis/Musculoskeletal Residual Functional Capacity Questionnaire. He reported he sees the claimant on a monthly basis with her initial visit being in 2004. Her current diagnoses included osteoarthritis, lumbar radiculopathy, degenerative disc disease at L5-S1 and fibromyalgia...Records dating through November 2007 indicate chronic complaints of arthralgias (Exhibit 13F)...
>
> On January 31, 2008, Samer Nasher, M.D. reported he first evaluated the claimant on March 27, 2006, and he last saw her on November 27, 2007. Dr. Nasher diagnosed claimant with chronic low back pain with lumbar radiculopathy (Exhibit 20F)...
>
> Based on this evidence, the undersigned finds the claimant's chronic arthralgias and degenerative disc disease of the lumbar spine are severe impairments...
>
> On December 19, 2006, the claimant complained of a several-year history of joint pain involving both hands and both knees. Neurological examination revealed some nonspecific sensory loss of the right hand diffusely and some mild stocking distribution sensory loss in both lower extremities. Her height was 5'4" and her weight was 215 pounds. The impressions included peripheral neuropathy, right carpal tunnel syndrome and chronic joint pain with osteoarthritis and reported history of rheumatoid arthritis. On December 19, 2006, the claimant reported she had been diagnosed with right carpal tunnel syndrome approximately six months ago and that she had an EMG and nerve conduction study of her legs, revealing peripheral neuropathy (Exhibit 6F). Dr. Ghali Bacha reports the claimant is diagnosed with peripheral neuropathy (Exhibit 13F). Based on this evidence, the

31

undersigned finds the claimant's carpal tunnel syndrome, peripheral neuropathy and obesity are severe impairments.

(Tr. at 12-14.)

As for the opinion evidence, Dr. Ghali Bacha completed an undated Arthritis/Musculoskeletal Residual Functional Capacity Questionnaire. He opined the claimant is likely to be absent from work as a result of her impairments or treatment about three times a month. He opined the claimant can walk no city blocks without rest or severe pain. He felt she could sit less than two hours and stand and/or walk about two hours during an eight-hour workday. He felt the claimant must walk every 90 minutes for approximately five minutes. He felt the claimant requires the ability to shift positions at will from sitting, standing or walking. He felt she needs unscheduled breaks once or twice during an eight-hour workday for approximately 15 minutes each. He felt she could rarely lift or carry less than 10 pounds and could never lift and carry 10 pounds or more. He felt she could occasionally climb stairs but could rarely twist or stoop (bend). He felt she could never crouch or climb ladders (Exhibit 1F). While Dr. Bacha is a treating source, the undersigned rejects these opinions as they are inconsistent with the treatment records and the objective evidence of record.

On December 29, 2006, A. Rafael Gomez, M.D., a State agency medical expert, reviewed the evidence of record and opined the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently. He felt she could stand and/or walk about six hours and sit about six hours during an eight-hour workday. He felt she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl. He felt she could never climb ladders, ropes or scaffolds. Dr. Gomez further opined the claimant must avoid concentrated exposure to vibration and hazards such as machinery and heights (Exhibit 8F).

On May 8, 2007, Amy Wirts, M.D., a State agency medical expert, reviewed the evidence of record and opined the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She felt she could stand and/or walk about six hours and sit about six hours during an eight-hour workday. She felt she is unable to perform repetitive pushing, pulling or grasping with her

32

bilateral upper extremities.  She can never crawl or climb ladders, ropes or scaffolds.  She can occasionally climb stairs and ramps, balance, stoop, kneel and crouch. She has a mild limitation in gross and fine manipulation with her right, dominant hand.  Dr. Wirts further opined the claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration and hazards, such as machinery and heights (Exhibit 11F).

The opinions of Drs. Gomez and Wirts are entitled to significant weight as they are well-supported by the objective and credible evidence of record.

On January 31, 2008, Samer Nasher, M.D., the claimant's treating physician, opined the claimant's pain is frequently severe enough to interfere with attention and concentration.  He felt the claimant's impairments were likely to produce "good days" and "bad days."  He felt the claimant would likely be absent from work as a result of her impairments or treatment about two times a month. He felt the claimant could walk two city blocks without rest or severe pain.  Dr. Nasher opined the claimant could sit and stand/walk a total of about four hours during an eight-hour workday.  He felt she must walk approximately five minutes every 30 minutes.  He felt she requires a job that would permit shifting positions at will from sitting, standing and walking.  He felt she would require one to two unscheduled breaks, lasting five to ten minutes each, during an eight-hour workday.  He felt she could frequently lift and carry 10 pounds.  He felt she could occasionally crouch and climb ladders and could rarely stoop (bend) and climb stairs.  Dr. Nasher further opined the claimant is capable of moderate stress (Exhibit 20F).  While Dr. Nasher is a treating source, the undersigned rejects these opinions as they are inconsistent with the treatment record and the objective evidence of record.

(Tr. at 20-21.)

The undersigned has thoroughly reviewed all the records from Drs. Bacha and Nasher and finds that the ALJ reached the correct conclusion.  As stated earlier, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1)

that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).

The court **FINDS** the ALJ fully and correctly considered the evidence of the treating physicians, Drs. Bacha and Nasher, the consultative examining physicians and the state agency record-reviewing medical sources of record in determining Claimant's physical status and weighed their opinions in keeping with the applicable regulations.

Substantial evidence supports the Commissioner's decision that Claimant is not disabled. The ALJ determined that Claimant did not have the residual functional capacity to perform the full range of light work because of certain limitations. When these limitations were included in a hypothetical question to the vocational expert, the vocational expert identified a significant number of jobs in the national economy that Claimant can perform. (Tr. at 23, 43-48.)

Fibromyalgia

Claimant also takes issue with the ALJ's failure to find that her fibromyalgia is a severe impairment. (Pl.'s Br. at 31-34.)

The Commissioner responds that the "ALJ accepted that Plaintiff had the medically determinable impairment of chronic arthralgias (Tr. 14), which amply captures fibromyalgia. See Tr.

34

523 (diagnosing "arthralgia most likely fibromyalgia").  (Def.'s
Br. at 16.)

The court finds that the ALJ properly evaluated Claimant's
fibromyalgia under the applicable regulations and Fourth Circuit
law. See 20 C.F.R. §§ 404.1520, 416.920 (2006); Stup v. UNUM Life
Ins. Co., 390 F.3d 301, 303 (4th Cir. 2004).

The court in Stup v. UNUM Life Insurance Company, 390 F.3d 301
(4th Cir. 2004), discussed fibromyalgia as follows:

> Fibromyalgia is a rheumatic disease with . . . symptoms
> including "significant pain and fatigue," tenderness,
> stiffness of joints, and disturbed sleep. Nat'l
> Institutes of Health, *Questions & Answers About
> Fibromyalgia* 1 (rev. June 2004),
> http://www.niams.nih.gov/hi/topics/fibromyalgia/Fibromy
> algia.pdf. *See also Ellis v. Metro Life Ins. Co.*, 126
> F.3d 228, 231 n.1 (4th Cir. 1997) (quoting Taber's
> Cyclopedic Medical Dictionary (16th ed. 1989)); *Sarchet
> v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996). Doctors
> diagnose fibromyalgia based on tenderness of at least
> eleven of eighteen standard trigger points on the body.
> *Sarchet*, 78 F.3d at 306. "People with rheumatoid
> arthritis and other autoimmune diseases, such as lupus,
> are particularly likely to develop fibromyalgia." Nat'l
> Institutes of Health, *supra*, at 4. Fibromyalgia "can
> interfere with a person's ability to carry on daily
> activities." *Id.* at 1. "Some people may have such a
> severe case of fibromyalgia as to be totally disabled
> from working, but most do not." *Sarchet*, 78 F.3d at 307
> (citations omitted).

Stup, 390 F.3d at 303.

Claimant asserts that the ALJ "completely ignored her
diagnosis of fibromyalgia." (Pl.'s Br. at 31.)  However, as
previously discussed on pages 8 and 9 of this Memorandum Opinion,
the undersigned finds the ALJ in his decision made several

35

references to Dr. Bacha's diagnoses of fibromyalgia and arthralgias and concluded that Claimant's "chronic arthralgias" were a severe impairment.  (Tr. at 12-14.)   Therefore, Claimant's argument is puzzling.  The undersigned notes that Claimant has acknowledged in a footnote that the ALJ found chronic arthralgias a severe impairment but states that arthralgia means "pain in the joint." (Pl.'s Br. at 32.)     However, as demonstrated on page 7 of this Memorandum Opinion, Dr. Bacha uses the terms "fibromyalgia" and "arthralgia" interchangeably in his treatment notes - those in the record before the ALJ and those submitted with Claimant's motion for remand.  (Pl.'s Motion, #17-2 at 2-5, 9, 15, 17, 31, 45.) Accordingly, the undersigned **FINDS** that substantial evidence supports the ALJ's finding that Claimant suffered severe impairment from chronic arthralgias and did not err in not specifically stating "fibromyalgia" as a severe condition.  Further, the ALJ's comprehensive residual functional capacity finding accommodated any limitations arising from chronic arthralgias, including fibromyalgia.

Mental Impairment

     Claimant also argues that the ALJ erred in not giving deference to the opinions of examining professional, Sheila Kelly, and in finding Claimant's mental impairments to be nonsevere. (Pl.'s Br. at 25-31.)  Specifically, Claimant asserts:

        [t]he opinion of Psychologist Sheila Kelly....was the
        most detailed, objective, and comprehensive psychological

evaluation in the record and it corresponded closely with Parsons' treatment record, her statements throughout the record, her testimony and the ALJ's determination of her severe impairments. Thus, the ALJ's abbreviated rejection of her opinion is reversible error.

(Pl.'s Br. at 25.)

In this case, the ALJ's determination that Parsons' mental impairments were non-severe is manifest error. First, he didn't follow the above described formula. Second, his description of Parsons' daily activities and social functioning is a distortion...The description of her daily activities by Tate, as quoted by the ALJ, would appear to be more expansive if one ignored the qualifications she repeatedly and consistently placed on them. Indeed, Kelly, who conducted a more detailed examination, concluded she left most of the housework to her husband and daughter...Even the ALJ recognized that his description of the daily activities was misleading as he noted that Parsons "greatly minimized" her daily activities, "but there is no basis for this in the record." (Tr. 20)...

The ALJ's conclusion that her mental impairments were non-severe is also directly contradicted by her treatment record and her medication regimine [sic, regimen]. In addition, the ALJ's claim of non-severity contradicts the very definition of Personality Disorder...Finally, and perhaps most importantly, the treatment notes from Parsons' treating family doctor and her pain specialist directly contradict the ALJ's finding of non-severity.

(Pl.'s Br. at 28-31.)

The Commissioner argues that the ALJ appropriately assessed the mental impairments evidence. (Def.'s Br. at 13-15.) Specifically, the Commissioner asserts:

[T]o the extent Plaintiff's argument is a challenge to the ALJ's finding of a non-severe mental impairment at step 2 of the sequential disability analysis - which it appears to be - it is entirely without merit because the ALJ found other severe impairments in this case, the ALJ again considered the issue of functional limitations presented by Plaintiff's mental impairment in his

37

residual functional capacity analysis, which eliminates
the issue...

[T]he record before the ALJ concerning Plaintiff's
claimed mental limitations was conflicting in the
extreme.  It was the ALJ's province to weigh the
evidence and resolve those conflicts...This principle
follows inexorably from the limited nature of
substantial evidence review of Social Security rulings.

(Def.'s Br. at 15.)

Plaintiff also argues that the ALJ was somehow compelled
to accept the opinion of Ms. Kelly, a one-time
psychological examiner, but this argument is extremely
weak, especially given that the report of another
psychological examiner, Lisa Tate, M.S., so extremely
conflicted with Ms. Kelly's report (Tr. 327-31).  The ALJ
pointed out that the limitations expressed in Ms. Kelly's
report also (1) appeared to be based on the subjective
complaints that the ALJ found so heavily contradicted by
the record (Tr. 22), and (2) were not even fully
supported by Ms. Kelly's own narrative report (Tr. 22).

(Def.'s Br. at 18, n.5.)

When evaluating a claimant's mental impairments, the Social

Security Administration uses a special sequential analysis outlined

at 20 C.F.R. §§ 404.1520a and 416.920a.  It appears to the court

that the ALJ used the sequential analysis which was amended

effective October 12, 2000.  First, symptoms, signs, and laboratory

findings are evaluated to determine whether a claimant has a

medically determinable mental impairment. §§ 404.1520a(b)(1) and

416.920a(b)(1)(2006).  Second, if the ALJ determines that an

impairment(s) exists, the ALJ must specify in his/her decision the

symptoms, signs, and laboratory findings that substantiate the

presence of the impairment(s).  §§ 404.1520a(b)(1) and (e),

416.920a(b)(1) and (e)(2006).  Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2)(2006).  Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2006).  The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme.  The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4) (2006).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2006).  Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2006).  Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3) and 416.920a(d)(3) (2006). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The

39

decision must include a specific finding as to the degree
of limitation in each of the functional areas described
in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2006).

In analyzing Claimant's mental impairments, the ALJ made these

findings:

On August 29, 2005, the claimant reported a calmer
attitude and less irritability, anxiety and depression
after taking Cymbalta (Exhibit 13F).  On November 25,
2006, the claimant underwent a consultative psychological
evaluation by Lisa C. Tate, M.A.  The claimant reported
frequently feeling anxious.  Identified symptoms included
feeling on edge, irritability, excessive worry, sleep
difficulty, increase in appetite and social withdrawal.
She reported previous symptoms of panic but reported she
had not experienced an attack since January 2006.  On
mental status examination, her mood was anxious and her
affect was mildly restricted.  Recent memory was mildly
deficient, and remote memory was mildly deficient.  The
remainder of her mental status examination was within
normal limits.  The impression was generalized anxiety
disorder (Exhibit 4F).

The claimant reports she is unable to work because she
has difficulty dealing with people.  She reports being
very irritable and fairly paranoid.  She believes people
are judging her.  She never had any friends in school,
and she was molested by her father as a child.  On
psychological evaluation of December 7, 2007 [Sheila E.
Kelly, M.A.], the claimant reported she had been treated
for the past year for anxiety attacks.  On mental status
examination, the claimant was depressed and frequently
tearful.  Testing revealed she read at a high school
level and performed arithmetic at a fourth-grade level.
The impressions were depressive disorder, not otherwise
specified versus major depressive disorder, chronic type;
history of panic disorder, possibly with agoraphobia;
social phobia; pain disorder associated with general
medical condition and psychological factors; possible
posttraumatic stress disorder secondary to childhood
sexual abuse; and personality disorder, not otherwise
specified, with paranoid, avoidant, dependent, passive-
aggressive, hypochondriacal and self-defeating features
(Exhibit 14F).

40

The claimant's medically determinable mental impairments of generalized anxiety disorder, depressive disorder, social phobia, pain disorder and personality disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.  In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has mild limitation.  The claimant reported on December 7, 2007, that she occasionally crochets and she reads a lot.  She showers almost every day (Exhibit 14F).  She reports watching television, performing household chores, helping care for her dogs and cats, preparing simple meals, doing laundry and shopping (Exhibit 11E).

The next functional area is social functioning.  In this area, the claimant has mild limitation.  On November 21, 2006, the claimant reported going with her husband to visit a friend two to three times a week, going to 7/11 one to two times a week, going to the grocery store one to two times a month and visiting her sister one to two times a month.  Social functioning was within normal limits based on the claimant's interaction with staff during her psychological evaluation (Exhibit 4F). Further, the undersigned observed the claimant to interact in a socially appropriate manner throughout the hearing.

The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitation. On consultative psychological evaluation of November 21, 2006, the claimant's concentration, persistence and pace were within normal limits (Exhibit 4F).  On evaluation of December 7, 2007, the claimant's complaints of deficiencies in concentration were not confirmed by the test results (Exhibit 14F).  The claimant reports watching television and crocheting.  Furthermore, the undersigned observed the claimant to concentrate adequately to answer all questions posed to her at the hearing.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Accordingly, the undersigned has translated the above "B" criteria into work-related functions in the residual functional assessment below.

(Tr. at 15-16.)

As to the effectiveness of treatment, the claimant does not undergo formal treatment for her psychological condition; however, she is prescribed medication by her primary care physician. While the claimant's testimony would indicate complete failure, the record indicates treatment has been successful as she has not undergone formal treatment and there is no evidence of a significant psychological limitation...

As to side effects of medication, there are none established which would interfere with the jobs identified below by the vocational expert. As to the claimant's activities of daily living, she has greatly minimized them but there is no basis for this in the record.

(Tr. at 20.)

The court **FINDS** Claimant's argument that the ALJ wrongfully evaluated Claimant's mental impairments to be without merit. The

ALJ properly noted Claimant's history of informal treatment for her psychological condition, including her medication, noted that her mental status examination with Ms. Tate was generally within normal limits, and fully discussed the various findings of the psychological evaluation of Ms. Kelly. (Tr. at 15.) The ALJ fully analyzed the psychological evidence of record and found Claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, thereby reaching the conclusion that Claimant's mental impairments are nonsevere per 20 CFR 404.1520a(d)(1) and 416.920a(d)(1).

Combination of Impairments

Claimant next argues that the ALJ failed to consider the combined effect of all Claimant's impairments, particularly as it pertains to her obesity. (Pl.'s Br. at 34-39.) Specifically, Claimant argues:

> The ALJ found that Parsons has severe impairments of "chronic arthralgias, degenerative disc disease, lumbar spine, carpal tunnel syndrom, peripheral neuropathy and obesity." (Tr. 12.)...
>
> [However] as the ALJ did not analyze or discuss Parsons' obesity in relation to the combination of her impairments at step three and five, there is no way a reviewing court can ascertain whether the ALJ's decision is based on substantial evidence.
>
> With respect to combination, the ALJ's failure to address obesity is not his only error. As pointed out above, he found a number of other severe impairments but he never analyzed them in combination. For instance, even if the ALJ had been correct in rejecting Parsons' mental

43

impairments as severe, he would still have had to consider their effects on her other impairments.

(Tr. at 34-38.)

The Commissioner responds that the ALJ appropriately considered Claimant's physical impairments, mental impairments, and obesity. (Def.'s Br. at 10-15, 19.) Specifically, in regards to the ALJ's obesity findings, the Commissioner notes: "Although no further discussion is warranted here, it is notable that although Plaintiff otherwise relies heavily on her treating doctor disability questionnaires, the treating doctors do not include obesity on their lists of relevant diagnoses (Tr. 301, 628)." (Def.'s Br. at 19.)

The social security regulations provide,

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923 (2006). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine

44

the impact on the ability of the claimant to engage in substantial gainful activity.  Id.  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In the subject claim, the ALJ analyzed the medical record and specifically found:

> The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> Social Security Ruling 02-1p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity.  The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above.  BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (KG/m2).  We generally will rely upon the judgment of a physician as to whether an individual is obese.
>
> As indicated in SSR 02-1p, obesity may have an adverse impact upon co-existing impairments.  For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone.  In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule. These considerations have been taken into account in reaching the conclusions herein.
>
> The claimant's chronic arthralgia is evaluated under Section 1.02 of the Listings.  However, there is no evidence of chronic joint pain and stiffness with signs

of limitation in motion or other abnormal motion of the affect joint resulting in an inability to perform fine or gross movements or inability to ambulate effectively.

The claimant's degenerative disc disease of the lumbar spine is evaluated under Section 1.04 of the Listing of Impairments for disorders of the spine.  However, the claimant does not have evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required by the Listings.  No sensory or reflex abnormalities were noted on examination.

The claimant's peripheral neuropathy is evaluated under Section 11.14 of the Listing of Impairments.  However, the claimant does not have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait or station.

The claimant's carpal tunnel syndrome is evaluated under Section 11.00 of the Listing of Impairments for neurological disorders.  However, the claimant's condition does not meet the criteria of any of the neurological listings.

Dr. Bacha opined the claimant suffers inflammatory spondylitis or other inflammatory spondyloarthropathies, with lesser deformity than in Listing 14.09B and lesser extra-articular features than in 14.09C, with signs of unilateral or bilateral sacroiliitis on appropriate medically acceptable imaging and with the extraarticular features described in 14.09D, thereby meeting the criteria of Listing 14.09E (Exhibit 1F).  The undersigned has considered this opinion; however, the claimant has no evidence of signs of unilateral or bilateral sacroiliitis on appropriate medically acceptable imaging.

(Tr. at 16-17.)

With respect to Claimant's argument that the ALJ failed to consider the "combined effects" of Claimant's impairments, particularly in regards to obesity, the court **FINDS** that the ALJ properly considered the "combined effects" of her impairments, in keeping with the applicable regulations, case law, and social

46

security ruling ("SSR") and that his findings are supported by substantial evidence.

Credibility Determination

Claimant next argues that the ALJ did not properly assess Claimant's credibility.  (Pl.'s Br. at 40-42.)   Specifically, Claimant asserts:

> The ALJ found that objective evidence could reasonably be expected to produce her pain and other symptoms, but then he circles back around and attacks Parsons' credibility because of the weak objective evidence.  (Tr. 19-20). Indeed, his entire focus is on such evidence.  Aside from engaging in circular reasoning and ignoring all the factors he is supposed to consider once a claimant meets the threshold test, he uses the "weak" objective physical evidence to discredit her psychological symptoms and limitations.  He then makes a selective use of her daily activities to discredit her mental health limitations...The ALJ also makes the blanket assert that her medications had no side effects that would interfere with her ability to do the job identified by the vocational expert.

(Pl.'s Br. at 41.)

The Commissioner argues that the ALJ properly assessed Claimant's credibility in regard to her physical and mental limitations.   (Def.'s Br. at 10-15.)   Specifically, the Commissioner provides ten examples of where "[t]he record in this case is littered with extreme inconsistencies in Plaintiff's critical statements" regarding her impairments that are "inconsistent with the overwhelming record evidence." (Def.'s Br. at 12-14.)

Social Security Ruling 96-7p clarifies when the evaluation of

symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Regarding Claimant's credibility, the ALJ made these findings:

48

The claimant testified to extreme symptoms and limitations, especially that she can stand for only five minutes before her legs and knees give out. The claimant testified that she currently undergoes no psychological treatment as she has no funds to pay for treatment. She received her medical card in October 2007, but she is unsure who will take it. Dr. Bacha does blood work and gives her pain medication for her arthritis. Her height is 5'4" and her weight is approximately 225 pounds. Dr. Nasher did testing for carpal tunnel and fibromyalgia. He has given her shots in her hands once a month for the past year, and the shots help her symptoms "a little." She takes Effexor for mood swings and depression. She takes Klonopin for anxiety attacks. She also takes Flexeril, Lortab and Topamax. She has no strength in her hands, and she has difficulty picking up a coffee cup. She drops glasses, and does not wear clothes with buttons or zippers. She does not wear shoes that tie. She seldom uses a keyboard or typewriter as she can use them for only approximately five minutes at a time. She has difficulty writing. She does not drive because Dr. Nasher has told her that driving will make her hands worse. She drops items such as a coffee cup, a pack of cigarettes and a hanger. IT depends on how bad her hands are hurting. She is unable to put her earrings on. He hands frequently go numb, and she testified that her right hand was numb at the hearing . Her medications cause her to feel drowsy and dizzy. She sleeps three to four hours during the day. She get up three to four times during the night to go to the restroom, go outside and walk around or read. She is in pain all the time from fibromyalgia, and she has difficulty sitting for long periods of time. She has a low energy level, and cold weather increases her pain. She sleeps under an electric blanket in the summer, and she always keeps the house warm. She has pain in her hands, neck, back, knees, feet and ankles. Her ankles sometimes swell so much that they hurt. Her husband rubs her feet and ankles, and props them up. Her feet and ankles are swollen most of the time. She has neuropathy in both her feet and hands, which makes it difficult for her to do anything. She used to walk two miles a day, but she is unable to do so now. She has mild headaches twice a week. She has a severe migraine headache approximately once a month, which lasts three to five hours. She has major mood swings and does not like people or being around them. She does not like to go out, and she has only one friend. She throws things, and she has crying

49

spells.  She has problems with her memory.  It has been two years since she has gone four-wheeling because she now has panic attacks.  She used to make blankets for people, but she is no longer able to do so.  She no longer cooks.  She occasionally does laundry.  Her husband and daughter usually load the dishwasher and perform the household chores.  She does not leave the house alone.  Her husband does the shopping and the finances.

However, the objective findings and treatment notes in the record do not support such extreme allegations.  On consultative physical examination of December 19, 2006, the claimant complained of constant lower back pain that sometimes runs into the shoulder blades, shoulders and arms.  On examination, the claimant's gait was only mildly slow and mildly stiff in appearance but without limp.  She was able to stand unassisted, able to rise from a seat and step up and down from the examination table without difficulty.  She appeared comfortable while seated and only mildly uncomfortable supine with back pain.  Examination of the lumbosacral spine revealed normal curvature.  There were complaints of mild pain on range of motion testing with muscular tenderness but no spasm.  Flexion was 80 degrees with normal range of motion otherwise.  The claimant was able to stand on one leg at a time without difficulty.  There was no leg length discrepancy.  The straight leg raising testing was to 90 degrees bilaterally in the sitting position without complaints.  Supine was 70 degrees bilaterally with some back pain on either side.  There was no tenderness on palpation of the hips, and evaluation of range of motion revealed no limitations (Exhibit 6F).  On October 26, 2007, the claimant underwent x-rays of the cervical and thoracic spines, which were normal.  An x-ray of the lumbar spine revealed only very mild lumbar spondylosis and vascular calcifications compatible with atherosclerotic disease of the aortic system (Exhibit 13F).

On December 19, 2006, the claimant complained of a several-year history of joint pain involving both hands and both knees.  However, she reported she had not had any joint injections or aspirations.  On examination of the extremities, the dorsalis pedis and posterior tibial pulses were palpable.  There were no bruits heard. There was no evidence of peripheral vascular insufficiency or chronic venous stasis.  There was no clubbing, cyanosis

50

or edema.   Examination of the knees revealed only some
mild pain on range of motion testing with tenderness on
the right knee with mild patellar femoral crepitus.
Flexion was 135 degrees with normal motion otherwise.
There was no redness, warmth or swelling about the right
knee.  Neurological examination revealed some nonspecific
sensory loss of the right hand diffusely and some mild
stocking   distribution   sensory   loss   in   both   lower
extremities.    Tinel   testing   at   the   wrists   seemed
negative.  There was no weakness or atrophy.  Effort on
manual muscle testing was good.   Deep tendon reflexes
were 2+ biceps and patella.   They were 1+ triceps and
Achilles.  The claimant was able to walk on the heels and
toes, able to walk hee-to-toe and squat but had knee pain
when doing so (Exhibit 6F).   X-rays of the bilateral
knees performed on October 26, 2007, were normal (Exhibit
13F).

On December 19, 2006, the claimant reported she had been
diagnosed with right carpal tunnel syndrome approximately
six months ago.  She reported being treated with carpal
tunnel   injections   and   a   splint,   which   she   uses
predominately   at   nighttime.     On   examination,   the
shoulders, elbows and wrists were nontender.   There was
no redness, warmth, swelling or nodules.  Evaluation of
range of motion revealed no limitations.  Examination of
the hands revealed no tenderness, redness, warmth or
swelling.   There was no atrophy, and the claimant was
able to make a fist bilaterally.  There were no Heberden
or Bouchard's nodes.  The claimant was able to button and
pick up coins with either hand or write with the dominant
hand without difficulty.  Evaluation of range of motion
revealed no limitations (Exhibit 6F).

Although the claimant alleges inability to use her hands,
she continues to occasionally crochet.   Although she
alleges inability to bend due to back pain, she continues
to do laundry.

Thus, the claimant is not credible in regard to her
physical limitations, and this lack of credibility
reflects poorly on her credibility in regard to her
psychological allegations.   The claimant also alleges
extreme   symptoms   in   regard   to   her   psychological
condition.  She stated she does not like people and does
not like to be around them.   She testified that she
throws things and that she goes nowhere alone.  Although
she has a medical card and undergoes treatment for her

physical condition, she testified that she does not
undergo formal treatment for any of her psychological
condition.   The record indicates she interacts in a
socially appropriate manner.   She visits friends and
relatives and goes shopping.   There is no indication of
greater than mild limitations as a result of her
psychological condition, and the treatment records do not
support the claimant's extreme allegations.

As to effectiveness of treatment, the claimant does not
undergo formal treatment for her psychological condition;
however, she is prescribed medication by her primary care
physician.  While the claimant's testimony would indicate
complete failure, the record indicates treatment has been
successful as she has not undergone formal treatment and
there is no evidence of a significant psychological
limitation.   As to effectiveness of physical treatment,
it has been rather conservative while the claimant
alleges such significant problems that it would be
expected that there would be intensification of
treatment, but that has not happened.

As to the side effects of medication, there were none
established which would interfere with the jobs
identified below by the vocational expert.

As to the claimant's activities of daily living, she has
greatly minimized them but there is no basis for this in
the record.

After considering the evidence of record, the undersigned
finds that the claimant's medically determinable
impairments could reasonably be expected to produce the
alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting
effects of these symptoms are not credible to the extent
they are inconsistent with the residual functional
capacity assessment for the reasons explained below...

(Tr. at 18-20.)

In his decision, the ALJ determined that Claimant had

medically determinable impairments that could cause her alleged

symptoms. (Tr. at 20.) The ALJ's decision contains a thorough

consideration of Claimant's daily activities, the location,

duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 18-20.)  The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. Id.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court **FINDS** that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is **DENIED**, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.  Further,

as previously stated, Claimant's motion to remand (docket no. 17) is **DENIED** as it is not appropriate pursuant to the sixth sentence of 42 U.S.C. § 405(g).

The Clerk is directed to transmit copies of this Memorandum Opinion to all counsel of record.

ENTER: March 30, 2011

Mary E. Stanley
United States Magistrate Judge

54